IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 4, 2023

### IN RE ELIJAH G.

**Appeal from the Juvenile Court for Smith County**
**No. 2022-JV-124     Branden Bellar, Judge**

_____

**No. M2023-00355-COA-R3-PT**

_____

A father appeals the termination of his parental rights to his child. The trial court terminated his parental rights on the grounds of abandonment by failure to visit, abandonment by failure to support, substantial noncompliance with the permanency plan, and failure to manifest an ability and willingness to assume custody. It also determined that termination was in the child's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which THOMAS R. FRIERSON II and KENNY W. ARMSTRONG, JJ., joined.

John B. Nisbet III, Livingston, Tennessee, for the appellant, John E.

Jonathan Skrmetti, Attorney General and Reporter, and Carrie Perras, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

**A.**

In February 2021, the Tennessee Department of Children's Services ("DCS") received a referral that eight-month-old Elijah G. had been physically abused. Destiny G. ("Mother") left the child in the care of her mother and sister, the child's grandmother and aunt. When the child stopped breathing, the grandmother called emergency services. After

learning about the call, Mother came to the family residence and physically attacked multiple people. The child was accidentally struck during the attack. Mother was arrested for domestic assault and, because she admitted to methamphetamine use, reckless endangerment of a child.

DCS filed a petition to declare the child dependent and neglected and for emergency temporary legal custody. John E. ("Father"), a resident of California, was identified as the child's father on his birth certificate. DCS contacted Father, but he was unable to assume custody at that time. The court issued a kinship protective custody order placing the child in the temporary custody of his maternal grandmother. But after the child tested positive for methamphetamine on a hair follicle drug screen, DCS filed an amended petition. And at the preliminary hearing, the court removed the child from the kinship placement and placed him in the temporary custody of DCS.

A few months later, the trial court adjudicated the child dependent and neglected. It granted a default adjudication as to Mother because she failed to make an appearance or otherwise defend against the action even though she was properly served. Father stipulated that the child was dependent and neglected as alleged in the amended petition. And, based on the child's positive hair follicle screen for methamphetamine, the court concluded that Mother committed severe child abuse. Neither parent appealed the adjudicatory order.

Before the removal, Father was not actively involved in the child's life. Young and unemployed, he lived with his mother and grandmother. He only met the child once when he came to Tennessee to sign the birth certificate. Still, he expressed a willingness to work with DCS so that he could assume custody of the child.

With Father's participation, DCS created a family permanency plan with the goals of adoption and reunification with a parent.[1] The plan was revised several times, but Father's responsibilities remained essentially the same. The permanency plan required Father to

(a) submit to a parenting assessment and follow all recommendations;
(b) submit to a psychological assessment and follow all recommendations;
(c) demonstrate sobriety by submitting to random and scheduled drug screens and making medications available for pill counts;
(d) provide proof of a legal means of income;
(e) provide proof of safe and stable housing;
(f) pay child support; and
(g) visit with the child on a regular basis.

_____

[1] Mother did not participate in the development of the plan or make any effort to work her responsibilities in the plan. She remained homeless, unemployed, and drug addicted.

Over the next year, Father made some progress on his plan responsibilities, but he never completed the recommendations from his assessments, obtained employment, or paid child support.

On May 16, 2022, DCS filed a petition to terminate Mother's and Father's parental rights. The petition alleged failure to manifest an ability and willingness to assume custody or financial responsibility for the child against both parents. It alleged severe child abuse as to Mother only. And, as to Father only, the petition alleged abandonment by failure to visit, abandonment by failure to support, and substantial noncompliance with the permanency plans.

The trial court found that DCS had proven all alleged grounds for termination of both Mother's and Father's parental rights by clear and convincing evidence. And it found termination of both parents' parental rights was in the child's best interest. Only Father appeals the termination of his parental rights. So we focus solely on the proof at trial related to termination of Father's parental rights.

B.

According to the DCS family service worker, Father completed a virtual mental health assessment with a parenting component with John Crody, a licensed professional counselor. Mr. Crody recommended parenting classes, a parenting support group, therapeutic individual counseling, and at least three face-to-face bonding sessions with the child. Father completed online parenting classes and the group activities before trial. And he was almost finished with the virtual counseling sessions.

But Father failed to follow the recommendations for visiting and bonding with the child. As Mr. Crody[2] explained, children under the age of three rely on physical contact, facial expressions, and tone of voice to form attachments. The child entered foster care at ten months of age. He had no previous relationship with Father. Mr. Crody recommended that Father meet with the child in person at least three times to begin to establish a bond. Without this bonding time, Mr. Crody believed that the child would experience a significant period of adjustment and distress if Father were to assume custody. And the child's development was likely to regress. He would also expect to see physical symptoms of distress in the child, such as stomach upsets and excessive crying. Despite Mr. Crody's warnings, Father never visited the child in person.

Instead, Father visited via video calls. Father had two scheduled thirty-minute visits each week. For the most part, Father complied with the visitation schedule. But, during the four months preceding the filing of the termination petition, he missed or cancelled five

---

[2] Mr. Crody testified by deposition.

visits.  And he often ended visits early, saying he needed to move his laundry or use the bathroom.

During her conversations with Father, the family service worker stressed the importance of scheduling an in-person visit with the child.  When Father claimed he could not afford to make the trip, she offered financial assistance.  She recalled making this offer at least four times during the four months preceding the termination petition.  Yet he always refused.

The witnesses agreed that there was little to no interaction between Father and the child during the video calls.  Father described the visits as "very distant."[3]  According to the foster mother, Father simply watched the child's activities.  Mr. Crody, who participated in two virtual visits, confirmed the lack of interaction.  In his opinion, no bond had been formed between Father and the child.

Father cited his lack of income for his failure to visit the child in person.  DCS only offered to pay for his travel costs or a hotel room, but not both.  So, even with the proffered assistance, he could not afford the trip.

Unemployed since 2020, Father did not provide any child support while the child was in DCS custody.  He was aware of his duty to support the child.  And he agreed that he was capable of working and earning enough income to support himself and the child.  But he struggled to find employment after the pandemic.  He did not have a car or a driver's license.  According to Father, he completed around 20 online job applications while the child was in foster care.  But his efforts were unsuccessful.  Still, he admitted that he only devoted a total of four or five hours to his job search.  And he chose not to use the employment resources DCS provided.

The family service worker explained that DCS could not place the child with Father without the approval of its California counterpart.  *See* Tenn. Code Ann. §§ 37-4-201 to -207 (2014) (Interstate Compact on Placement of Children).  And California rejected DCS's initial application to start the interstate process because Father had not completed seventy percent of his plan responsibilities.  DCS could not reapply until Father reached that benchmark. Without California's participation, DCS could not verify Father's sobriety or evaluate the safety of his home.

By the time of trial, the child was two and a half years old.  He had been with his current foster family since he was thirteen months old.  He called his foster parents

---

[3] Father called in thirty minutes after trial began and requested to participate by phone.  The court granted his request.  Father had no explanation for his failure to notify the court or his attorney that he would not be present at trial.

"Momma" and "Daddy." He was thriving in his current home, where he enjoyed spending time with his foster parents' children and grandchildren. His foster parents wished to adopt him.

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody their child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. The government's interest in the welfare of a child justifies interference with a parent's constitutional rights in certain circumstances. *See* Tenn. Code Ann. § 36-1-113(g) (2021).

Tennessee Code Annotated § 36-1-113 describes both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one statutory ground for termination. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. Code Ann. § 36-1-113(c)(1). If they prove the existence of one or more statutory grounds, they then must prove that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interests by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c)); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d at 546. This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); TENN. R. APP. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

## A.

Father does not challenge the trial court's finding of statutory grounds for termination. Still, we "must review the trial court's findings as to each ground for termination." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016).

### 1. Abandonment by Failure to Visit and Failure to Support

"Abandonment by the parent" is one of the statutory grounds for termination of parental rights. Tenn. Code Ann. § 36-1-113(g)(1). The word "abandonment" is statutorily defined in multiple ways. *See id.* § 36-1-102(1)(A) (Supp. 2022). A parent can be deemed to have abandoned a child when "[f]or a period of four (4) consecutive months immediately preceding the filing of a . . . petition to terminate the parental rights of the parent . . .," the parent either "failed to visit" or "failed to support" the child. *Id.* § 36-1-102(1)(A)(i). For Father, this period ran from January 16, 2022 to May 15, 2022. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period).

Like the trial court, we conclude that the evidence is clear and convincing that Father abandoned the child by his failure to visit during the statutory period. The failure to visit includes the failure to "engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Visitation is token when it is "perfunctory" or "of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." *Id.* § 36-1-102(1)(C). To determine whether a parent's visits were token, we look at the "frequency, duration, and quality of the visits" as well as any evidence of "the parent's conduct and the relationship between the child and the parent up to this point." *See In re Keri C.*, 384 S.W.3d 731, 749-50 (Tenn. Ct. App. 2010).

The evidence does not preponderate against the trial court's finding that Father's virtual visits were token. Father did not have a pre-existing relationship with the child. Given his young age, the child needed in-person contact to establish a bond. Although Father was aware of Mr. Crody's recommendation of at least three face-to-face visits, he only visited the child virtually. He rejected DCS's repeated offers to pay for either his lodging or travel costs so that he could visit the child in person. And his thirty-minute virtual visits were ineffective. There was no interaction between Father and child. He simply watched while the child played. He often ended the visits early to attend to mundane tasks, such as laundry. Father did not use his visitation to create a meaningful relationship with the child. He remained a virtual stranger. *See In re Draven K.*, No. E2019-00768-COA-R3-PT, 2020 WL 91634, at *5 (Tenn. Ct. App. Jan. 7, 2020) (agreeing that a parent's failure to engage with a child during visitation can be "nothing more than perfunctory or 'token' visitation").

The evidence is equally clear and convincing that Father abandoned the child when he failed to support the child or make any reasonable payments toward the child's support during the statutory period. Father was aware of his duty to support the child. Yet he never provided any support—monetary or in-kind—throughout the child's placement with DCS. He was unemployed. But Father's financial constraints were not a valid defense to this ground for termination. *See* Tenn. Code Ann. § 36-1-102(1)(D) ("That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant time period.").

2. Substantial Noncompliance with Permanency Plan

Another ground for termination is "substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." *Id.* § 36-1-113(g)(2). Before analyzing a parent's compliance with the permanency plan, the court must find that the plan's requirements were "reasonable and [we]re related to remedying the conditions that necessitate foster care placement." *Id.* § 37-2-403(a)(2)(C) (Supp. 2022). Permanency plan requirements may focus on remedying "conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547.

We agree with the trial court's finding that the permanency plan requirements were reasonable and related to remedying the conditions that prevented family reunification. Before DCS could reunite the child with Father, it needed to verify that Father could provide the child with a safe and appropriate home. To that end, the plan required Father to provide proof of legal income and stable housing; complete a mental health and parenting assessment and follow any recommendations; demonstrate sobriety; pay child support; and maintain a relationship with the child through regular visitation.

To establish this ground for termination, DCS must prove the parent's noncompliance was substantial in light of the importance of the requirements to the overall plan. *Id.* at 548-49. Trivial or minor deviations do not rise to the level of substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). We presume the court's findings of fact concerning the parent's compliance are correct unless the evidence preponderates against them. *See In re Valentine*, 79 S.W.3d at 547. But whether the parent's noncompliance was substantial "is a question of law which we review de novo with no presumption of correctness." *Id.* at 548.

We agree with the trial court that DCS proved this ground for termination by clear and convincing evidence. Although Father completed some tasks, he failed to accomplish two important plan requirements. By the time of trial, the child had been in foster care for almost two years. Yet Father never took the necessary steps to create a bond with the child. And he never obtained employment. *See In re Bonnie L.*, No. M2014-01576-COA-R3-PT,

7

2015 WL 3661868, at *10 (Tenn. Ct. App. June 12, 2015) (affirming the ground of substantial noncompliance where a father's compliance with a permanency plan "largely consisted of completing several tasks without making meaningful changes that would permit the safe return of his children"). As a virtual stranger without adequate income, Father was not an appropriate caregiver for the child.

3. Failure to Manifest an Ability and Willingness to Assume Custody

The trial court also found termination of Father's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he "[1] failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody . . . of the child, and [2] placing the child in the [parent's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). The statute does not define precisely the circumstances that might pose a risk of "substantial harm" to a child. *See id.* But the risk must come from the child's placement in the parent's legal and physical custody. *Id.* And the harm must be "a real hazard or danger that is not minor, trivial, or insignificant" and is "more than a theoretical possibility." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001). Both the failure-to-manifest and the substantial-harm prongs must be established by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020).

Like the trial court, we conclude that Father showed neither ability nor willingness to assume physical custody of or financial responsibility for the child. He repeatedly failed to prioritize visitation with the child. He never scheduled in-person visits. He missed or ended visits early on multiple occasions. Unemployed, he failed to make any child support payments or provide in-kind support for the child. And, over a two-year span, he spent no more than a few hours applying for jobs.

We also agree that placing the child with Father would pose a significant, non-theoretical risk of harm to the child. The child and Father were essentially strangers. The child was bonded with his foster parents and their extended families. Mr. Crody explained that he would expect a significant period of adjustment and distress if the child were placed with Father without Father first bonding with the child. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (finding that a risk of substantial harm existed if the child were returned to a parent who was a "virtual stranger" when the child had a strong bond with the current caregivers).

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not

always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). The best interests analysis should consider "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499.

Tennessee Code Annotated § 36-1-113(i) lists twenty factors for courts to consider in determining whether termination of parental rights is in the child's best interests. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[ ] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535.

The first three factors emphasize the child's critical need for stability and continuity. Factors (A) and (B) analyze "the effect a termination of parental rights will have on the child's critical need for stability and continuity of placement . . ." and "the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition." Tenn. Code Ann. § 36-1-113(i)(1)(A)-(B). Factor (C) looks to whether the parent has demonstrated continuity and stability in meeting the child's basic needs. *Id.* § 36-1-113(i)(1)(C). The trial court found that termination of parental rights would have a positive impact on the child's need for stability while a change of caregivers would be detrimental. The child has stability with his foster parents, the only family he remembers, and they wish to adopt him. Father has never provided for the child's needs. Removing the child from his current, stable environment and placing him with a virtual stranger is likely to cause him emotional trauma.

Factors (D) and (E) question whether the parent and child have or can reasonably create a healthy attachment and whether the parent has maintained regular contact with the child and used it to create a positive relationship. *Id.* § 36-1-113(i)(1)(D)-(E). The trial court found no evidence of a bond between Father and the child. And it had no reasonable expectation that Father could create one. In the child's eyes, Father was a stranger that watched him play. Father did little to engage the child during his virtual visits. And he made no effort to visit the child in person. He repeatedly refused DCS's offers to assist him with travel costs. Father asserts on appeal that it was unreasonable to expect him to travel to Tennessee when DCS only offered to pay for part of his travel expenses. But given the child's age, we cannot say this was an unreasonable expectation. DCS offered to cover a significant portion of his expenses. By his own admission, Father did "not put in full effort of being able to get myself out there and get my son." Without in-person contact, it is unlikely that Father will ever form a meaningful relationship with the child.

9

Factors (H) and (I) consider the child's significant relationships in the absence of the parent. *Id.* § 36-1-113(i)(1)(H)-(I). The court found the child had bonded with his foster parents and formed close relationships with the foster parents' children and grandchildren.

Factor (J) looks at whether the parent has made a lasting adjustment to the parent's circumstances such that the child could be safe in the parent's care. *Id.* § 36-1-113(i)(1)(J). And the next two factors ask the court to consider what resources were available to assist the parent in making a lasting change. *Id.* § 36-1-113(i)(1)(K)-(L). The trial court found Father failed to demonstrate a lasting adjustment despite DCS's reasonable efforts to assist him. He never obtained employment or visited the child in person. Although DCS provided employment resources and offered to pay for either Father's travel or lodging in Tennessee, Father failed to take advantage of this assistance.

In the court's view, multiple other factors favored termination. Father never provided safe and stable care for the child. *See id.* § 36-1-113(i)(1)(O). He showed no understanding of the child's basic or specific needs. *See id.* § 36-1-113(i)(1)(P). Father's failure to form a bond with the child or secure adequate income in almost two years showed his lack of commitment to creating a home in which the child could thrive. *See id.* § 36-1-113(i)(1)(Q). Father never provided any financial support for the child. *See id.* § 36-1-113(i)(1)(S).

Contrary to Father's arguments on appeal, the evidence does not preponderate against these findings. The combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interest.

## III.

We affirm the termination of Father's parental rights. The record contains clear and convincing evidence to support four statutory grounds for termination of his parental rights. And we conclude that terminating Father's parental rights was in the child's best interest.

_____s/ W. Neal McBrayer_____
W. NEAL McBRAYER, JUDGE
